UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

EARL TRUVIA, ET AL                                          CIVIL ACTION

VERSUS                                                      NO.  04-0680 c/w 04-0682

HENRY P. JULIEN, JR., ET AL                                 SECTION  "N"  (2)

## ORDER AND REASONS

Presently before the Court are motions for summary judgment filed by Defendants Harry Connick, in his official capacity as the (former) District Attorney for the Parish of Orleans, the City of New Orleans, and former New Orleans Police Detectives Micelli and Heath (Rec. Docs. 88 and 150).  Having carefully considered the parties' supporting and opposing submissions, and applicable law,  **IT IS ORDERED**, for the reasons stated herein, that the motions are **GRANTED**, and that Plaintiffs' claims are **DISMISSED WITH PREJUDICE**.  Additionally, because Defendant Eddie Jordan, in his official capacity as the (former) District Attorney for the Parish of Orleans, is named solely as the successor to Defendant Harry Connick, in his official capacity as the (former) District Attorney for the Parish of Orleans, **IT IS FURTHER ORDERED** that Plaintiffs' claims against Defendant Jordan are likewise **DISMISSED WITH PREJUDICE**.

## BACKGROUND

In 1976, Plaintiffs, Earl Truvia and Gregory Bright, were found guilty, in Louisiana state court, of the October 31, 1975 murder of Elliot Porter.  They were sentenced to life imprisonment without parole.  Thereafter, in 2002, finding violations of *Brady v. Maryland*, 373

U.S. 83 (1963), had occurred in connection with Plaintiffs' trial, Judge Charles L. Elloie, of the Criminal District Court for the Parish of Orleans, State of Louisiana, vacated the convictions.  In March 2003, the Louisiana Supreme Court denied the State of Louisiana's application for a writ of certiorari.  *See State v. Truvia*, 839 So.2d 35 (La. 2003).  Following the State of Louisiana's eventual dismissal of the criminal charges filed against Plaintiffs, they were released from custody.

Based on these events, Plaintiffs filed suit, in 2004, against (1) Harry Connick, individually and in his official capacity as the (former) District Attorney for the Parish of Orleans ("DA"); (2) Eddie Jordan, in his official capacity as the District Attorney for the Parish of Orleans; (3) the City of New Orleans; (4) the New Orleans Police Department (NOPD); (5) former Assistant District Attorneys Henry Julien and Kurt Sins; and (5) NOPD Detectives Joseph Micelli and George Heath.[1]  Plaintiffs assert claims under state and federal law, including 42 U.S.C. §§ 1983, 1985, 1988.  They allege violations of the Fourth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, constituting malicious investigation, false arrest, malicious prosecution, and false imprisonment.

---

[1]  The claims against Defendant Connick, in his individual capacity, along with the claims against Henry Julien and Kurt Sins were dismissed by Judge Porteous in 2004.  *See* Rec. Docs. 32-33, and 70.  Plaintiffs also previously voluntarily dismissed their claims against former New Orleans Police Department Officers/Detectives Lawrence Elsensohn, Pascal Saladino and Robert Laviolette.  *See* Rec. Docs. 260 and 267.

## LAW AND ARGUMENT

### I.  Summary Judgment Standard

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows  that there is no genuine dispute as to any material fact and the movant  is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed.2d 202 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its summary judgment burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim.  *See* Fed. R. Civ. P. 56(c);  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986);  *see also Lavespere v. Liberty Mut. Ins. Co.*, 910 F.2d 167, 178 (5th Cir. 1990). Once the moving party carries its burden pursuant to Rule 56(a), the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S. Ct. 2553;  *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed.2d 538 (1986); *Auguster v. Vermillion Parish School Bd.,* 249 F.3d 400, 402 (5th Cir. 2001).

When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, *Gillis v. Louisiana,* 294 F.3d 755, 758 (5th Cir.

2002), and draws all reasonable inferences in favor of that party. *Hunt v. Rapides Healthcare System, L.L.C.,* 277 F.3d 757, 764 (2001). Factual controversies are to be resolved in favor of the nonmoving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (citations omitted). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *See id.* (emphasis in original) (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed.2d 695 (1990)).

Although the Court is to consider the full record in ruling on a motion for summary judgment, Rule 56 does not obligate it to search for evidence to support a party's opposition to summary judgment. *See* Fed. R. Civ. P. 56(c)(3)("court need consider only the cited materials"); *Malacara v. Garber,* 353 F.3d 393, 405 (5th Cir. 2003)("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."). Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims. *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S. Ct. 195 (1994).

The nonmovant's burden of demonstrating a genuine issue is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence." *Little,* 37 F.3d at 1075. Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. *Smith v. Amedisys*, 298 F.3d 434, 440 (5th Cir. 2002).

## II.  Substantive Law and Application of Legal Principles

### A.  Motion filed by (former) District Attorney Connick

Plaintiffs' actions arise under 42 U.S.C. § 1983, which provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Recognizing that the initial inquiry in such actions is whether the plaintiff has suffered a constitutional violation as a result of the defendant's actions, Plaintiffs contend that their state post-conviction proceedings conclusively establish that they did indeed suffer such a violation. Defendants vehemently disagree.  Plaintiffs further contend that Defendant Connick, as DA, had a policy, custom, or practice of violating criminal defendants' constitutional rights, under *Brady*, by purposefully withholding exculpatory evidence.  According to Plaintiffs, Connick also failed to train and supervise his prosecutors on the requirements of *Brady* such that his failure constitutes deliberate indifference actionable under § 1983.  Finally, Plaintiffs contend that Connick's alleged deficiencies actually caused violations of their *Brady* rights.

Legal principles governing Plaintiffs' claims under §1983 were recently discussed in *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011):

> A municipality or other local government may be liable under this section if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 692, 98 S. Ct. 2018, 56 L. Ed.2d 611 (1978). But, under §1983, local governments are responsible only for "their own illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S. Ct. 1292, 89 L. Ed.2d 452 (1986) (citing *Monell*, 436 U.S., at 665-683, 98 S. Ct.

5

2018). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691, 98 S. Ct. 2018; *Canton*, 489 U.S. at 392, 109 S. Ct. 1197; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L. Ed.2d 626 (1997) (collecting cases).

Plaintiffs who seek to impose liability on local governments under §1983 must prove that "action pursuant to official municipal policy" caused their injury. *Monell*, 436 U.S., at 691, 98 S. Ct. 2018; see *id.*, at 694, 98 S. Ct. 2018. Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. *See ibid.; Pembaur*, supra, at 480–481, 106 S. Ct. 1292; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–168, 90 S. Ct. 1598, 26 L. Ed.2d 142 (1970). These are "action[s] for which the municipality is actually responsible." *Pembaur*, *supra,* at 479–480, 106 S. Ct. 1292.

Addressing a governmental entity's alleged failure to properly train employees regarding their constitutional duties, the Supreme Court additionally explained:

In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton*, 489 U.S. at 388, 109 S. Ct. 1197. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.*, at 389, 109 S. Ct. 1197.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cty*., 520 U.S. at 410, 117 S. Ct. 1382. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training

program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.*, at 407, 117 S. Ct. 1382. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton*, 489 U.S., at 395, 109 S. Ct. 1197 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities . . . ." *Id.,* at 392, 109 S. Ct. 1197; *see also Pembaur*, supra, at 483, 106 S. Ct. 1292 (opinion of Brennan, J.) ("[M]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials . . .").

A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. *Bryan Cty.*, 520 U.S., at 409, 117 S. Ct. 1382. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability." *Id.*, at 407, 117 S. Ct. 1382. Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

* * *

[C]ontemporaneous or subsequent conduct [,however,] cannot establish a pattern of violations that would provide "notice to the cit[y] and the opportunity to conform to constitutional dictates . . . ." *Canton*, 489 U.S., at 395, 109 S. Ct. 1197 (O'Connor, J., concurring in part and dissenting in part).

*Connick v. Thompson*, 131 S. Ct. at 1359-60 and n.7. To prevail on a failure to train claim under §1983, the plaintiff also must prove that the lack of training actually caused the *Brady* violation at issue. *Id.* at 1358 and n.5.

For purposes of the instant motion, the Court assumes, without deciding, that a *Brady*

violation did occur in connection with Plaintiffs' 1976 criminal trial.  Nevertheless, the Court finds that no triable issue has been demonstrated relative to the existence of a policy, custom, or practice in Connick's office, in 1975 and 1976, of violating criminal defendants' constitutional rights, under *Brady* and its progeny, by purposefully withholding exculpatory evidence.  The Court likewise rejects Plaintiffs' contention that, in 1975 and 1976, Connick also failed to train and supervise his prosecutors regarding the requirements of *Brady* such that his failure constitutes deliberate indifference actionable under § 1983.

### 1.  DA Connick's Official Policy

Connick's evidentiary submissions support the existence of an official policy, during the pendency of the criminal proceedings at issue here, directed toward compliance with applicable law, including *Brady* and its progeny.  As discussed in Connick's memoranda, the Code of Professional Responsibility required disclosure of exculpatory evidence in 1976.[2]  Additionally, Connick's own affidavit and deposition testimony, as well as the affidavits of a number of persons working as Assistant District Attorneys during the time period at issue here, including then Assistant District Attorney ("ADA") Henry Julien, prosecutor in Plaintiffs' criminal case, maintain that, prior to and after the indictment of Truvia and Bright, Connick's official policy recognized prosecutors' legal and ethical obligations to comply with applicable law concerning evidence disclosure, including *Brady* and *Giglio*, and the Louisiana Code of Professional Responsibility.[3]  The affidavits

---

[2]        See DR 7-103(B) of the Louisiana Code of Professional Responsibility.

[3]        See Affidavit Exhibits to Connick's Memorandum in Support of Motion for Summary Judgment ("Connick's Orig. Mem."), Rec. Doc. 88-2, including Affidavit of Harry Connick (Rec. Doc.  88-2, pp. 28-30), ¶¶ 7-9 and 15-17; Transcript of Harry Connick Deposition ("Connick Depo.")(Rec. Doc. 100-17), at 59-61; Transcript of Henry Julien Deposition ("Julien Depo.")(Rec. Doc. 267-3), at 19-30, 50, 73 and 112.

further aver that none of the affiants were ever aware of any custom or practice on the part of Connick or any ADA to purposefully or intentionally withhold *Brady* material; and that Connick never "encouraged, directed, or even hinted, that anyone should cover up, destroy, or hide *Brady* material."[4]

The Court finds Plaintiffs' arguments to the contrary to be unavailing. Specifically, Plaintiffs point to discovery responses given by Julien in this matter,[5] and other discovery requests and responses provided by various counsel in other, unrelated cases during 1975 and 1976.[6] Julien's response to Bright's requests for exculpatory evidence, however, does not refuse to provide such evidence. Rather, it simply provides: "State is not in possession of any."[7]  In his deposition, Julien related that he answered in this fashion because he had no responsive documents in his possession, and did not think any exculpatory evidence existed about which he should ask the police department.[8]  With respect to the request for a "FBI rap sheet" for any intended witnesses, Julien responded that the defense "is not entitled to this information," because he did not see how that could be *Brady* information.[9]  But, in any event, Julien also explained that, regardless of his written discovery responses in a given case, he and Pat Quinlan, the senior prosecutor with whom he was

_____

[4]        *Id.*

[5]        See Prayer for Oyer (Rec. Doc. 100-4);  Answer to Prayer for Oyer (Rec. Doc. 100-6).

[6]        See Plaintiffs's Exhibits J, K, and Q (Rec. Docs. 100-10, 135 (manual attachment), and 238).

[7]        See Answer to Prayer for Oyer (Rec. Doc. 100-6).

[8]        See Julien Depo. (Rec. Doc. 267-3), at 125-132.

[9]        *Id.* at 125.

assigned to work, routinely allowed defense counsel to review the prosecution's case file prior to trial, and did so in Plaintiffs' criminal case.[10] Significantly, Plaintiffs have put forth no evidence, including deposition or affidavit testimony of Plaintiffs' criminal defense counsel, to the contrary. Julien also indicated that if he had had a FBI rap sheet in his possession, he probably would have provided it to defense counsel.[11]

As presented, the Court additionally finds the numerous discovery requests and responses provided by Plaintiffs from other, unrelated matters to be problematic and of little value. Although Plaintiffs maintain that these documents reveal numerous *Brady* violations from ADA's in Connick's office, that conclusion cannot be drawn based solely on the documents themselves. The Court is provided with no explanation of the facts of those cases, no indication of any court resolution of the discovery requests,[12] no proof that *Brady* material existed and was actually withheld, and no proof that a *Brady* violation occurred. Indeed, certain of the responses indicate that the State either had no such material, or had none in addition to that which had already been provided.[13] Nor do Plaintiffs provide the affidavit or deposition testimony of *any* of the numerous ADA's and defense attorneys who submitted the discovery requests and responses in an effort to shed light on the actual meaning of these documents, the resolution of the requests, the apparently

---

10 *Id.* at 96-100, 117, 120-23, and 140-45; Affidavit of Henry Julien ("Julien Affid.") (Rec. Doc. 88-2, pp. 31-33) at ¶¶ 15-20.

11 *Id.* at 113.

12 Most of the discovery requests are presented in the form of prayer and/or motion and are accompanied by a proposed "show cause" order for the court. See, *e.g.*, Plaintiffs' Exhibit K (Rec. Doc. 135).

13 See, *e.g.*, Plaintiffs' Exhibits 4 and 6 (Rec. Doc. 135) (Manual Attachment). Further, many of the documents are largely illegible. See, *e.g.*, Plaintiffs' Supp. Exhibit Q (Rec. Doc. 238).

restricted nature and procedures for pre-trial criminal discovery and other evidentiary disclosures during the relative time period, and whether or not responsive information actually was disclosed notwithstanding the contents of the written responses.  This omission is particularly significant given that a number of the discovery responses apparently were submitted by the same former ADA's who have submitted affidavits, in support of Connick's motion, addressing Connick's *Brady* policies and the training provided during their tenure in his office.[14]

## 2. <u>Prosecutorial Training</u>

Turning to the issue of *Brady* training, the Court likewise is not convinced, on the showing made, that attorney training in Connick's office was legally deficient relative to prosecutorial obligations regarding exculpatory evidence.  And, even if it were, there is no indication that Connick, as policymaker for the DA's office in 1975 and 1976, was deliberately indifferent at that time to such inadequacies and the likelihood of resulting constitutional violations.

As previously discussed, the Code of Professional Responsibility, to which all ADA's were subject, required disclosure of exculpatory evidence in 1976.  Further, the testimony offered by former ADA Julien, and the affidavits submitted by a number of other former ADA's, indicate that they regularly received interoffice updates regarding pertinent jurisprudence, and participated in periodic "in house" group training sessions, in addition to attending, or reviewing materials obtained from, outside seminars and district attorney meetings.[15]  Additionally, junior ADA's, including Julien, were paired with more experienced attorneys for supervision and on-the

---

[14]     See Affidavit Exhibits to Connick's Orig. Mem. (Rec. Doc. 88-2).

[15]     See Julien Affid. (Rec. Doc. 88-2, pp. 31-33) at ¶¶5-6; Affidavit Exhibits to Connick's Orig. Mem. (Rec. Doc. 88-2); Julien Depo. (Rec. Doc.267-3) at 14-19, 43-44;  Connick Depo. (Rec. Doc. 100-16, 100-17, and 100-18) at 27-31, 35-36, and 53-58.

job training, including training regarding *Brady* material.[16]   Indeed, as previously stated, Julien

testified that he and Pat Quinlan, the senior prosecutor with whom he worked for Plaintiffs' criminal

case, routinely allowed defense counsel, including those who represented Plaintiffs to review their

case file prior to trial.[17]   Junior ADA's also would consult with more experienced prosecutors

regarding any evidentiary questions they might have.[18]   Finally, Plaintiffs point to no reported

instance of similar *Brady* violations, occurring *prior* to 1976, that arguably may have alerted

Connick to a need at that time for additional training of his ADA's regarding disclosure of

exculpatory evidence.   Under these circumstances, and also for the reasons discussed at length by

the Supreme Court in *Connick v. Thompson*, 131 S. Ct. at 1360-67,[19] the Court finds no triable claim

as to attorney training exists here.   The Court additionally finds support for this conclusion in *Cousin

v. Small,* 325 F.3d 627 (5th Cir. 2003), wherein the Fifth Circuit entered summary judgment in

Connick's favor, concluding no genuine issue of material fact existed as to the Plaintiffs' failure to

---

[16]     See Julien Depo. (Rec. Doc. 267-3), at 38-41, 69-70; Affidavit Exhibits to Connick's Orig. Mem.(Rec. Doc. 88-2).

[17]     See Julien Depo. (Rec. Doc. 267-3), at 96-100, 117, 120-23, and 140-45;  Julien Affid. (Rec. Doc. 88-2, pp. 31-33), at ¶¶15-20.

[18]     See Julien Depo. (Rec. Doc. 267-3), at 40-43, 49-54, 69-70, and 117;  Affidavit Exhibits to Connick's Orig. Mem. (Rec. Doc. 88-2), including Affidavit of John S. Baker, Jr. (Rec. Doc.  88-2, p. 2), ¶10.

[19]     In *Connick v. Thompson*, the Supreme Court explained why the "single incident" liability hypothesized in *Canton v. Harris,* 489 U.S. 378, 109 S. Ct. 1197 (1989), concerning the obvious need to train novice armed police officers regarding constitutional constraints on the use of deadly force, did not similarly apply to prosecutors with respect to *Brady* obligations. 131 S. Ct. at 1360-67.  The Court emphasized that "[a]ttorneys are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment." *Id.* at 1361.  The Court also referenced the on-the-job training received by junior prosecutors in the Orleans Parish DA's office, and prosecutors' ethical obligation to "'seek justice, not merely to convict,'" and to produce *Brady* evidence to the defense.  *Id.* at 1362.

train claim.

**B.  Motion filed by City of New Orleans, and (former) Detectives Micelli and Heath**

Plaintiffs' claims against the City of New Orleans and former NOPD Detectives Micelli and Heath also are asserted under §1983 and likewise concern alleged violations of the constitutional obligations recognized in *Brady* and its progeny.  The Court also finds these claims to be legally ineffectual.

**1.  Defendants Micelli and Heath**

Focusing first on the remaining individual defendants, former Detectives Micelli and Heath, Plaintiffs contend that they:  (1) withheld evidence of the arrests of three other people (Ricky Truvia, Ricky Navarro, and Kevin Smith) for Elliot Porter's murder;  (2) withheld evidence that an eyewitness, Alfred Marshall, placed two other murder suspects (Ed Johnson and Deatrice Symms) at the scene of the crime, on the night of the murder, looking for the victim, threatening to harm the victim, and having a motive to harm the victim over a bad drug deal; (3) affirmatively provided misleading evidence that there was no credible information as related to the bad drug deal theory by claiming this was merely an unsubstantiated "rumor" and that there were no eyewitnesses to support this rumor;  (4) withheld a background check on the lone prosecution witness (Sheila Caston Robertson), which would have provided overwhelming impeachment evidence that she had given a false name, had mental health issues, had abused her children, and/or had a drug problem; and (5) manipulated the key witness, Sheila Caston Robertson, who stated that she did not know where the suspects lived, but then suddenly took these defendants to the suspects' apartments – and actually pointed out the incorrect address for plaintiff Truvia.[20]

---

[20]     See Plaintiffs' Supplemental Opposition Memorandum (Rec. Doc. 260) at 2.

The Court finds that Plaintiffs' claims against these defendants are without merit and/or are precluded by qualified immunity principles.  Police officers "are entitled to qualified immunity on summary judgment unless a plaintiff (1) has 'adduced sufficient evidence to raise a genuine [dispute] of material fact suggesting [the officers'] conduct violated an actual constitutional right,' and (2) the officers' 'actions were objectively unreasonable in light of clearly established law at the time of the conduct in question.'" *Poole v. City of Shreveport,* No. 11-30158, 2012 WL 3517357, *3 (5th Cir. 2012)(quoting *Brumfield v. Hollins,* 551 F.3d 322, 326 (5th Cir. 2008)." "'Although nominally an affirmative defense, the plaintiff has the burden to negate the defense once properly raised.'" *Id.*  "This standard, even on summary judgment, 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (internal quotation marks omitted).  As explained by the Supreme Court in *Pearson v.  Callahan,* 555 U.S. 223, 231, 244-45,  129 S. Ct.  808, 815, 823 (2009):

> The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed.2d 396 (1982). Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez,* 540 U.S. 551, 567, 124 S. Ct. 1284, 157 L.Ed.2d 1068 (2004) (Kennedy, J., dissenting) (quoting *Butz v. Economou,* 438 U.S. 478, 507, 98 S.Ct. 2894, 57 L. Ed.2d 895 (1978)), for the proposition that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law").
>
> * * *
>
> This inquiry turns on the "objective legal reasonableness of the

action, assessed in light of the legal rules that were clearly established at the time it was taken." *Wilson v. Layne*, 526 U.S. 603, 614, 119 S. Ct. 1692, 143 L.Ed.2d 818 (1999) (internal quotation marks omitted); see *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L. Ed.2d 666 (2002) ("[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful" (internal quotation marks omitted)).

* * *

The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law.

Having carefully reviewed the parties' voluminous submissions, including the deposition testimony of Henry Julien, George Heath, Joseph Micelli, Pascal Saladino, and Robert Laviolette, Jr., it is not clear that former ADA Henry Julien received each and every document completed by the detectives investigating the Elliot Porter murder during the course of their investigation. What has not been contradicted by Plaintiffs' evidentiary submissions, however, are Julien's assertions that he allowed defense counsel to review his case file pre-trial, that all of the detectives investigating the Porter murder testified that it was their practice to document all pertinent information gathered during the course of an investigation, whether favorable or not to an identified suspect, and that none of the detectives purposefully withheld from the prosecution material evidence known to be favorable to the underlying criminal case against Plaintiffs. Further, the case cited by Plaintiffs as "clearly established law" regarding police officers, *Luna v. Beto*, 395 F.2d 35 (5th Cir. 1968)(en banc), *cert. denied*, 394 U.S. 966, 89 S.Ct. 1310 (1969),[21] at most established that

---

[21]      In their opposition memoranda, Plaintiffs actually cite to the panel opinion, which ordered reversal of the district court's denial of federal habeas relief. See Rec. Doc. 164 at 6; Rec. Doc. 260 at 4 and 8 (citing *Luna v. Beto*, 391 F.2d 329 (5th Cir. 1967). On rehearing, en banc, however, the Fifth Circuit found the authority cited by the panel majority to be inapposite and, thus, affirmed the district court. See *Luna v. Beto*, 395 F.2d 35 (5th Cir. 1968)(en banc), *cert. denied*, 394 U.S. 966, 89 S.Ct. 1310 (1969). Moreover, though arguing the law to be "clearly established" for purposes of their claims against the individual officers, another part of Plaintiffs' submission

a *Brady* violation may occur, justifying federal habeas relief, if a police officer deliberately conceals exculpatory evidence. Thus, because the Court finds no triable issue exists in Plaintiffs' favor, relative to a purposeful concealment by the individual defendants of evidence favorable to Plaintiffs, qualified immunity principles protect the individual defendants from liability in this matter.

Furthermore, focusing on Plaintiffs' first specific allegation, even if Ricky Truvia, Ricky Navarro, and Kevin Smith were arrested by police in the sense that they were taken to the police station for questioning, and were not "free to go" during that interview, no evidence supports the notion that they were ever formally booked, or charged with Elliot Porter's murder, or were considered serious suspects following their alleged temporary detention. In any event, Plaintiffs have put forth no evidence suggesting that any of these three individuals had anything to do with the crime at issue. Thus, the claims lack merit. *See Crawford v. Cain*, No.04-0748, 2006 WL 1968872, * 18-19, (E.D. La. 7/11/06)(Vance, J.) (requiring plausible nexus to the crime), *aff'd*, 248 Fed.Appx. 500 (5th Cir. 2007), *cert. denied,* 552 U.S. 1183 (2008).

Turning to Plaintiffs' second contention, it is undisputed that Alfred Marshall was not an "eyewitness" to the actual murder of Elliot Porter. Rather, his affidavit indicates only that he saw and talked with Ed Johnson and Deatrice Symms while "at the Project" on the night before the (early morning) murder.[22] Significantly, Plaintiffs provide no citation to deposition testimony reflecting questioning of the individual defendants by them regarding the veracity of Mr. Marshall's affidavit, or why no reference to him is made in the case report. In any event, Defendants are correct that the alternative suspects and conduct referenced by Mr. Marshall already had been

---

describes *Brady* as being "the subject of constantly evolving" Supreme Court jurisprudence during that time. See Rec. Doc. 164 at 19.

[22]   See Alfred Marshall Affidavit (Rec. Doc. 164-2), at ¶3.

16

communicated by other persons to the detectives, and, moreover, questioning by counsel during the underlying criminal trial reflects that Plaintiffs' criminal defense counsel were aware of these two suspects and the allegations that had been made relative to them.[23]  Additionally, other accounts to police regarding these two suspects were reflected in the detectives' case report that was provided to former ADA Julien, and, as indicated above, Plaintiffs point to no testimony – by affidavit or otherwise – by defense counsel for their criminal trial, or other contrary evidence, refuting Julien's assertion that he allowed Plaintiffs' criminal defense counsel to review that report prior to the trial. Thus, even if Mr. Marshall's comments to detectives arguably should have been noted in the police case report, the Court, on the showing made, does not find their omission to deprive the individual defendants of qualified immunity.

Regarding Plaintiffs' next assertion, *i.e.*, that the individual defendants "affirmatively provid[ed] misleading evidence that there was no credible information as related to the bad drug deal theory by claiming this was merely an unsubstantiated 'rumor' and there were no eyewitnesses to support this rumor," the individual defendants are immune from liability regarding any testimony offered by them.  To the extent that this allegation concerns statements made in the police case report, the Court, for reasons previously stated, and on the showing made, likewise finds such statements protected by qualified immunity.

Plaintiffs' fourth contention concerns an allegedly withheld background check of prosecution witness Sheila Caston Robertson, which they contend would have provided overwhelming impeachment evidence demonstrating that she had given a false name, had mental

---

[23]      See Trial Transcript, *State of Louisiana v. Truvia and Bright* ("Trial Transcript") (Rec. Doc. 267-4), at 24-26, 30-31, 33-39, 54-55;  see also Julien Depo. (Rec. Doc. 267-3), at 118-120.

health issues, had abused her children, and/or had a drug problem.  It is unclear from the parties'
submissions whether the police detectives here actually obtained a report of Sheila Caston
Robertson's criminal record, though it is undisputed that such checks frequently were done by them
with material witnesses.  Even if one were done, however, there is no indication that the detectives'
inquiry would have gone beyond a criminal background check.

   Significantly, the only documentation provided to the Court regarding criminal
conduct by Sheila Caston Robertson, occurring *prior* to the 1976 trial, concerns a 1966 juvenile
conviction, when she was approximately 12 years old, for aggravated battery (striking two persons
with a stick) and subsequent parole matters in 1969 and (possibly) 1973.[24]  All other criminal
conduct reflected in these documents occurred years after the 1976 trial.[25]  It is unclear to the Court
whether these juvenile records would have been available to the detectives in 1976, or even
appropriately recorded in the case report.  Further, there is no indication that the individual
defendants in fact obtained the referenced Division of Family Services records for 1975 and 1976,[26]
that accessing such records was standard procedure for them, or that any of the detectives or ADA
Julien had notice of any facts suggesting that such a query regarding Sheila Caston Robertson's
children or mental health was appropriate in this instance.  Accordingly, this contention offers
Plaintiffs no legal relief.

   Finally, the Court does not find sufficient evidentiary support for Plaintiffs' last
assertion regarding the individual defendants' alleged manipulation of Sheila Caston Robertson

---

[24]  See Plaintiffs' Exhibit C (Rec. Doc. 164-4).

[25]  *Id.*

[26]  See Plaintiffs' Exhibit D (Rec. Doc. 164-5).

relative to the identification of  plaintiff Truvia's home.  Mere speculation about the explanation provided by individual defendants regarding the matter is insufficient.

### 2. City of New Orleans (NOPD)

The Court likewise finds Plaintiffs' claims against the City of New Orleans lack merit.  Although in hindsight the practices of the NOPD, in 1975 and 1976, arguably could have been better, in terms of ensuring that the DA's office had *all* police department documentation relative to a particular case, and those practices likely are different from those employed today, Plaintiffs have not demonstrated a triable issue as to the existence of an official NOPD policy, custom, or practice, during that time, of violating constitutional rights by purposefully withholding exculpatory evidence from the prosecutor and defendant.  This is particularly true when the state of the law, in late 1975 and early 1976, regarding police obligations relative to *Brady* and its progeny, as discussed above, is considered.[27]

On the showing made, the Court additionally finds no triable issue to exist with respect to whether the NOPD's training of its officers relative to *Brady* obligations, during the time period at issue, reflects a policy of deliberate indifference.  As set forth above, the law in late 1975

---

[27]     Indeed, the parties' submissions suggest that if police investigators did not provide certain documents to the DA, the selection seemingly turned on the type of document, *e.g.,* detectives' field notes or daily reports, rather than a case report or field arrest report, or how comprehensive other documents were, rather than its contents.  See, *e.g.,* Julien Depo. (Rec. Doc. 267-3), at 45-48, and 53-68;  Transcript of Joseph Micelli Deposition ("Micelli Depo.") (Rec. Doc. 267-1), at 37-40 and 50-51;  Transcript of George Heath Deposition ("Heath Depo.") (Rec. Doc. 115), at 26-29, 42-44, 68-83; Transcript of Pascal Saladino Deposition ("Saladino Depo.")(Rec. Doc.150, Exhibit 4)(Manual Attachment), at 17-20, 59-64; Transcript of Robert Laviolette, Jr. Deposition ("Laviolette Depo.")(Rec. Doc.150, Exhibit 5)(Manual Attachment), at 6-14. Additionally, although certainly not an excuse for any constitutional violations found to have occurred in the past, the reality of the disparity in technology available for use by police departments and prosecutors in 1975-76, as compared to that in existence today, or even twenty years ago, cannot be ignored.  Present-day parties, counsel, and courts must remain mindful of this.

and 1976 regarding police obligations was far from being well developed or settled.[28]  Nor is it determinative that the detectives who investigated the Elliot Porter murder in 1975, when deposed more than thirty years later, in 2007, could not provide a legal definition of "exculpatory evidence" or "*Brady* information."  The investigating detectives' deposition testimony demonstrates an overall understanding that pertinent information, whether supportive of a particular person's innocence or not, was to be reported, and that investigative information was not purposefully withheld from the DA's office.  Plaintiffs have not produced evidence to the contrary.[29]

---

[28]     See also note 27.

[29]     Specifically, once the legal meaning of "exculpatory evidence" or "*Brady* information" was clarified, former Detective Micelli essentially testified that he likely would have noted such evidence in case reports, which were intended to be as accurate as possible, with no intentional material omissions, and that he never purposefully withheld any investigative information from the DA.  See Micelli Depo. (Rec. Doc. 267-1), at 26-41, 46-50,73-74, 125-132,137-140, 161 and 173.  With respect to persons with whom he talked during the course of the investigation, he would not list every person but would record anything "worth reporting."  *Id.* at 161.  See also Trial Transcript (Rec. Doc. 267-4) at 44, and 53-54.  He also indicated that he was never specifically asked by the DA's office to provide information that "would show or suggest that the criminal defendant is actually innocent."  See Micelli Depo. (Rec. Doc. 267-1), at 40 and 50.

Former Detective Heath testified that the detective's duty was to collect evidence and report anything pertinent to the case, regardless of whether it supported the guilt of one person versus the other, and that he was never told by a supervisor to "throw out" evidence that might be relevant to a case.  See Heath Depo. (Rec. Doc. 115), at 24, 30-34, 79 and 83-85.  Throughout his deposition testimony, he also emphasized that much of a detective's training was on-the-job training gained by working with other experienced detectives.  Former Detective and co-defendant Saladino testified that all leads pertinent to the case would be investigated and documented, regardless of whether they ultimately supported the guilt of a particular person or not, that any changes in witness testimony would be documented and provided to the DA, and that he would not throw away any evidence favorable to a defendant. See Saladino Depo. (Rec. Doc.150, Exhibit 4)(Manual Attachment), at 28-33, 35, 45-48, and  57.  Former Detective and co-defendant  Laviolette similarly testified that all leads followed, and any evidence gathered, tending to support the innocence of a defendant, would be documented in the detective's daily report. See Laviolette Depo. (Rec. Doc.150, Exhibit 5)(Manual Attachment), at  8-13.

**III.  Conclusion**

For the foregoing reasons, the Court finds that no genuine issue of material fact exists for trial and that the remaining defendants are entitled to judgment as a matter of law.  Accordingly, Plaintiffs' claims against the remaining defendants are dismissed with prejudice.

New Orleans, Louisiana, this 10th day of September 2012.

**KURT D. ENGELHARDT**
**United States District Judge**

21